# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

SULLIVAN COUNTY FABRICATION INC.,

                    Plaintiff,

            -against-                    20 Civ. 5750(PMH)

SELECTIVE INSURANCE COMPANY of
AMERICA, et al.,

                    Defendants.

------------------------------------x

                                    United States Courthouse
                                    White Plains, New York

                                    May 19, 2021


                        THE HONORABLE PHILIP M. HALPERN,
                              District Court Judge




FINKELSTEIN BLANKENSTHIP FREI-PEARSON & GARBER LLP
            Attorneys for Plaintiff
            One North Broadway
            White Plains, New York 10601
BY:  TODD S. GARBER


WILLIAMS & CONNOLLY LLP
            Attorneys for Defendants
            725 12TH sTREET nw
            Washington, DC 20005
BY:  KENNETH J. BROWN




                Angela O'Donnell - Official Court Reporter
                            914-390-4025

1          THE COURT:  Good afternoon, counsel.  Please be

2     seated.

3          THE DEPUTY CLERK:  In the matter of Sullivan County

4     Fabrication Inc. against Selective Insurance Company of

5     America, et al.

6          Would the plaintiff please stand and note your

7     appearance.

8          MR. GARBER:  Todd Garber, Finkelstein Blankinship

9     Frei-Pearson & Garber LLP, for the plaintiff, your Honor.

10         THE DEPUTY CLERK:  Defense counsel please stand and

11     note your appearance.

12         MR. BROWN:  Ken Brown from William & Connolly on

13     behalf of the defendants.  With me at counsel table is my

14     colleague, Riley Clafton.

15         THE COURT:  Angela, how are you?

16         All right, before me today is defendants' Selective

17     Insurance Company of America and Selective Way Insurance

18     Company's motion to dismiss the complaint filed by the

19     plaintiff Sullivan County Fabrication Inc., on July 24, 2020.

20         Plaintiff brings this action on its own behalf and on

21     behalf of both class of insurance policyholders who paid

22     insurance premiums in exchange for commercial insurance

23     policies that included its lost business income and extra

24     expense coverage.  On November 20th, 2020, defendants moved to

25     dismiss for failure to state a claim.  Docket number 20.

1           Counsel asks to be heard.  I'm delighted to have

2   people in a courtroom.  I hope you're equally delighted.  I got

3   to this new job, I took my oath, I guess you get the job when

4   the President signs your commission, he did that for me on

5   February 21, but I took my oath on March 10th, 2020.  And so

6   seeing people is something new.  But I'm privileged to be here,

7   I'm delighted.  It's an honor for me to sit here, and I admire

8   the work that's been done here.  You're asking me to call balls

9   and strikes.  I'm going to do that this afternoon.  But

10  irrespective of that, I appreciate the effort, the desire of

11  each of you, each side, to convince me of your position.

12          So I'm happy to hear from whoever wants to be heard.

13          MR. BROWN:  Yes, thank you, your Honor.  And again

14  it's Ken Brown from Williams & Connolly from the defendants.

15          Your Honor, in our reply brief, which, as you

16  mentioned, was filed on November 20th of last year, we reported

17  that 30 courts had granted motions to dismiss COVID-19 business

18  interruption claims based on the plain text of exclusions and

19  coverage provisions like those in SCF's, Sullivan County

20  Fabrication, or SCF's policy.  Over the ensuing six months,

21  that number has increased to more than 200 decisions.  There

22  are so many decisions dismissing materially identical claims

23  that it would be impossible to discuss them all, and the good

24  news for everyone's sake that we don't need to.

25          This case is governed by New York law.  There is a

1  much more manageable number of New York cases, all of which

2  have been resolved in favor of insurers on the precise issues

3  before the Court.  This case is no different, and to see why,

4  we start with a foundational principle of New York law as

5  stated by the Court of Appeals that, as with any contact, the

6  unambiguous provisions of an insurance contract must be given

7  their plain and ordinary meaning, and the interpretation of

8  such provisions is a question of law for the Court.

9        Here, we start with the unambiguous language of the

10  virus exclusion, which states, we will not pay for loss or

11  damage caused by or resulting from any virus, bacterium, or

12  other microorganism that induces or is capable of inducing

13  physical distress, illness, or disease.  This provision is not

14  ambiguous, and there is no question that the losses alleged by

15  the plaintiff were caused by, or as an alternative, resulted

16  from the coronavirus.

17        Indeed, the majority of SCF's complaint is devoted to

18  detailing the effects of the virus on the plaintiff's business,

19  including in a section called "The COVID pandemic causes

20  business enclosures."

21        This conclusion that the virus exclusion applies here

22  is consistent with decisions across the country.  There are now

23  more than forty decisions dismissing COVID-19 business

24  interruption claims based on verbatim identical exclusions.

25        Your Honor, I have a hand-up, really a series of

1    hand-ups, for the Court, if I may, if I may approach.

2            THE COURT:  Sure.  Give them to Mr. Cangelosi.

3            MR. BROWN:  Certainly.

4            And your Honor, if you look at tab one of your

5    hand-up, this is simply a list of these more than 40 decisions

6    dismissing COVID claims based on verbatim, identical

7    exclusions.  I will note that this list does not contain the

8    dozens and dozens of additional cases dismissing these claims

9    based on highly similar exclusions.  These are only the ones

10   that are verbatim identical.

11           SCF asserts three arguments in response, and I'll

12   address them in turn.

13           First it argues that its losses were caused by the

14   stay-at-home orders and not the virus.  This argument has been

15   rejected as a matter of course by more than 70 cases, and those

16   cases are listed at tab two of your hand-up.  Representative of

17   those holdings is the District of New Jersey's decision in

18   *Causeway Auto* where the Court ruled that a case with identical

19   caused-by or resulting-from language, in that case with that

20   language the Court wrote, the but for cause of plaintiff's

21   losses was COVID-19.  The Executive Orders and the virus are so

22   inextricably connected that it is undeniable that the orders

23   were issued because of the virus.

24           Second, SCF argues that instead of focusing on the

25   language of the exclusion, it offers arguments about what that

1   language appears to be focused on or is directed towards.  But

2   under New York law, we look at the plain language of the

3   provision, we don't interpret an unambiguous contract based on

4   anyone's subjective sense of its intent.

5           Third, SCF asked the Court to read both parts of the

6   disjunctive phrase caused by or resulting from as not only

7   requiring causation but as requiring proximate causation.  But

8   the New York courts have been crystal clear the terms separated

9   by the disjunctive "or" mean different things.

10          SCF invokes the same principle in seeking coverage in

11  this case where it argues that direct physical loss of property

12  means something different than direct physical damage to

13  property.  That's true.  SCF is right about that.  Just as

14  caused by means something different than resulting from.  And

15  the authorities are clear that resulting from requires only but

16  for causation, which unquestionably exists here.  I think

17  everyone agrees that SCF would not have sustained its alleged

18  losses but for the coronavirus.

19          Let me turn quickly to the ordinance or law

20  exclusion.  And again, I'll start with the plain language which

21  says, we will not pay for loss or damage caused directly or

22  indirectly by the enforcement of or compliance with any

23  ordinance or law regulating the construction, use, or repair of

24  any property.  Here, SCF alleges that because of the

25  stay-at-home orders it has been unable to use its properties

1    for their intended purposes.  That's paragraph 45 of the

2    complaint.  And it is true that the orders, which have the

3    force of law, regulate the use of property.  Therefore the

4    ordinance or law exclusion applies.

5            In response, SCF does not even acknowledge the

6    language of the exclusion, instead it talks about the context

7    in which it sometimes arises, its alleged purpose and the way

8    in which SCF purportedly expected it to be construed.  But

9    never once does it mention the plain language of the exclusion,

10   and it does not dispute that that language bars coverage here.

11           SCF's only other argument is that the ordinance or

12   law exclusion conflicts with civil authority coverage.  That

13   argument is easily dispensed with.  The ordinance or law

14   exclusion bars coverage for losses caused by any ordinance or

15   law regulating the use of property.  Forgive me, your Honor.

16           THE COURT:  Relax and keep it nice, even pace.

17           MR. BROWN:  Oh, sure.

18           THE COURT:  Our court reporter is meticulous as at

19   getting every word.  So take your time.

20           MR. BROWN:  Will do.

21           THE COURT:  I'm here to listen.  We're going to build

22   a record, so whoever is unhappy can do whatever they need to.

23   Take care of Ms. O'Donnell because she's taking care of us.

24           MR. BROWN:  That sounds like a plan, your Honor.

25           So the ordinance or law exclusion bars coverage for

1  losses that were caused by any ordinance or law regulating the

2  use of property.  Civil authority coverage, in contrast, deals

3  with the complete denial of access to SCF's facility under the

4  condition set forth in that coverage provision.  Here, there

5  has been no complete denial of access to SCF's facility.  The

6  owners could go there as they wished.  The allegation, which

7  SCF makes repeatedly, is that it was prevented from using its

8  properties for their intended purposes.  Plaintiff's

9  allegations do not fall within the civil authority coverage,

10  but they fall squarely within the ordinance or law exclusion.

11       Now let me talk about coverage, and I'll start with

12  business income, an extra expense which applies only where

13  business income does.  I'll begin again with the plain language

14  of the policy, and two provisions in particular.

15       First the business income and extra expense

16  endorsement, which states, we will pay for the actual loss of

17  business income you sustain due to the necessary suspension of

18  your operations during the period of restoration.  The

19  suspension must be caused by direct physical loss of or damage

20  to property at premises which are described in the

21  declarations.

22       The period of restoration, in turn, is the period

23  that begins either 72 hours after the time of direct physical

24  loss or damage for business income coverage, or immediately

25  after the time of direct physical loss or damage for extra

1    expense coverage, and it ends when either the property at the

2    described premises should be repaired, rebuilt, or replaced, or

3    business is resumed at a new, permanent location.  When you put

4    these definitions together, it is clear beyond the slightest

5    shadow of a doubt that coverage requires the actual physical

6    loss of or damage to the insured premises.  The New York case

7    law is unanimous in saying so.  And there currently are more

8    than 240 decisions across the country saying the same thing.

9          SCF responds with a few arguments which are familiar

10   to anyone who has kept up with the national COVID docket.

11         First, it claims that the mere loss of use for its

12   property for its intended purpose qualifies as direct physical

13   loss of or damage to the property itself.  This argument has

14   been made and rejected in virtually every COVID-19 coverage

15   case.  And if you look at tabs three and four of your hand-up

16   those cases speak to that issue.  Tab three is cases rejecting

17   the mere loss of use, and tab four is cases that require actual

18   physical loss of or damage to property.  And to be sure, there

19   is significant overlap between them.

20         There is something of an embarrassment of riches in

21   terms of case law on our side of this issue, but I'll direct

22   the Court to just a couple of decisions from New York courts.

23         And first Judge Cronan's decision in the *Michael*

24   *Cetta* case where he wrote that losing the ability to use

25   otherwise unaltered or existing property simply does not change

1    the physical condition or presence of that property and

2    therefore cannot be classified as a form of direct, physical

3    loss or damage, citing *Couch On Insurance*.  Also, the *Sharde*

4    *Harvey* decision issued by Magistrate Judge Lehrburger, on

5    March 18 of this year.  The COVID-19 pandemic and shutdown

6    orders may have created a loss of use of property, but they did

7    not cause physical damage to property requiring dismissal here.

8    The Court went on to note that the idea that a government

9    shutdown order standing alone can trigger business interruption

10   insurance has been consistently rejected by courts applying New

11   York law.  And I would also note the *Food for Thought* case

12   decided on March 6 in which the Court held that because the

13   plaintiff alleges that it sustained business income losses when

14   it lost the physical use of its property as a result of

15   government mandated closure orders, the plaintiff has failed to

16   plead facts sufficient to establish that it suffered a direct

17   physical loss of or physical damage to its property.

18           I will also note that all three of these decisions,

19   *Michael Cetta, Sharde Harvey*, and *Food for Thought*, all cite

20   the *Roundabout Theatre* case which the First Department held

21   that this same language requires actual physical loss of or

22   damage to property and that the mere loss of use is

23   insufficient.  *Roundabout Theatre* is binding on this Court.

24           THE COURT:  It's binding but it's persuasive.

25           MR. BROWN:  Well, it's a First Department case, and

1    generally the rule is that absent contrary direction from the

2    Court of Appeals on questions of state law, the decisions of

3    the intermediate appellate court should be binding.

4           Nor can the mere loss of use possibly trigger any

5    period of restoration, as there is nothing to repair, rebuild,

6    or replace.  As Judge Cronan wrote in denying coverage to

7    *Michael Cetta*, the alleged loss of use here requires no

8    physical repair or rebuilding to end the suspension of the

9    insured's operation.  And here, this conclusion is even clearer

10   as SCF repeatedly disclaims the presence of coronavirus at its

11   property.

12          The cases that SCF cites in response, like *Studio*

13   *417*, *North State Deli*, *Urogynecology Specialist*, overwhelmingly

14   have been distinguished, heavily criticized as having been

15   wrongly decided, or in many cases both, including in many of

16   the cases cited in our most recent submission of supplemental

17   authority.  There have been hundreds of COVID-19 business

18   interruption cases decided.  The fact that there is a small

19   minority that, respectfully, in our view, gets the answers

20   wrong, is not a surprise.

21          What is notable is that in some of those cases the

22   same courts have corrected what we view as their mistakes.

23   Judge Conway, for example, in the Middle District of Florida,

24   who issued the *Urogynecology* opinion, recently decided a case

25   called *Tanq*'s which is 2021 Westlaw 1940291 on April 16 of this

1   year in which she dismissed a COVID-19 business interruption

2   claim.  The Court acknowledged the *Urogynecology* decision but

3   held that in *Tanq's* the parties had provided the relevant

4   coverage forms to the court, and the virus exclusion in that

5   policy required dismissal.  That exclusion used the identical

6   caused-by or resulting-from language that we have here.

7           SCF also argues that we are reading the terms

8   physical loss of property and physical damage to property to be

9   redundant.  We are not.  Those terms have distinct meanings.

10  Physical damage to property is self-explanatory.  Physical loss

11  of property, in contrast, is the total theft or destruction of

12  property as might occur in a tornado or a fire.  The *Real*

13  *Hospitality* case, which is cited at page 9 of our reply brief,

14  makes this point using the example of tables in a restaurant

15  fire.  Some might be completely destroyed.  That would be the

16  physical loss of property.  Some, in contrast, might only be

17  charred or otherwise damaged.  That would be physical damage to

18  property.  The terms are not redundant.

19          SCF finally notes that other coverage parts within

20  the policy that are not implicated in this case define the term

21  property damage, a term that is not used in any of the coverage

22  provisions at issue here to encompass the loss of use.  Two

23  responses.

24          First, the term property damage does not include the

25  words direct or physical.  So when the property states in the

1   commercial general liability coverage form, which is not at

2   issue here, that property damage includes the loss of use of

3   tangible property that is not physically injured, that can only

4   be juxtaposed against the language used in the business income

5   coverage provision which is at issue here and which requires

6   direct, physical loss of or damage to property.

7           The presence of this language in our coverage

8   provision makes the argument about property damage completely

9   irrelevant.

10          And second, we know the definition of property damage

11  doesn't apply here.  The relevant language in the business

12  income coverage provision, as we know, is direct physical loss

13  of or damage to property.  And SCF rightly concedes at page

14  eight of its brief that "the policy does not define these

15  terms."  That lack of a definition means that the language at

16  issue here, direct physical loss of or damage to property, must

17  be given its plain English meaning under which it requires, as

18  its language suggests, actual physical loss of or damage to

19  property itself.  There is no dispute here that as in all of

20  the New York cases, SCF alleges only a loss of use and not

21  damage to the property itself.

22          I'll end by briefly addressing the civil authority

23  coverage.  We don't need to take long here.  Civil authority

24  coverage applies where there is a direct physical loss of or

25  damage to a property, not the insured property but a different

 1   property, within one mile of the insured property which causes

 2   a dangerous physical condition requiring the issuance of a

 3   civil authority order and that order completely prohibits

 4   access to the insured property.  SCF does not acknowledge these

 5   requirements much less does it address their application here.

 6   But when we do so, we find that none of them are met.  The

 7   plaintiff does not allege four things:

 8          One, it doesn't allege direct physical loss of or

 9   damage to any property anywhere, much less some unspecified

10   property within a mile of the insured property;

11          Second, SCF does not allege that such nonexistent

12   physical loss or damage created a dangerous physical condition;

13          Third, SCF does not allege that a civil authority

14   issued an order in response to that nonexistent, dangerous

15   physical condition; and

16          Finally, SCF does not allege that it was completely

17   prohibited from accessing its property as a result.  Instead,

18   as we know, it alleges a loss of use, not a prohibition on

19   access.  To quote *Sharde Harvey* again, nearly all of the

20   New York COVID-19 cases discussed above also address civil

21   authority provisions.  They involve the exact same New York

22   shutdown orders at issue here, and all of them found that the

23   plaintiffs were not entitled to coverage.  So, too, here.

24          Finally, we noted that SCF cannot recover punitive

25   damages, has no good faith and fair dealing claim, and that the

1  Selective Insurance Company of America, which did not issue the

2  policy at issue here, is not a proper defendant.  We'll rely on

3  our briefs for those arguments.

4         So for the foregoing reasons, the motion to dismiss

5  should be granted.  And because SCF opted not to amend its

6  complaint based on the premotion letters, and because no

7  amendment could cure the defects in the complaint, the

8  dismissal should be with prejudice.

9         Thank you, your Honor.

10         THE COURT:  Thank you, Mr. Brown.

11         MR. BROWN:  Mr. Garber.

12         MR. GARBER:  Thank you, your Honor.

13         Your Honor, I'll start with the business income

14  section and the term direct physical loss of or physical damage

15  to the property and defendants' argument in support of that.

16         I think both parties agree that, as a general

17  principle of interpreting insurance contracts, any ambiguities

18  are to be construed against the drafter, the insurer.  So

19  starting from that principle, the question is then is the term

20  direct physical loss of or physical damage to ambiguous or read

21  in favor of the plaintiff so that the case can go forward, or

22  is it unambiguous in favor of the defendant in this case.

23         I'm not disputing that the majority of cases that

24  have decided the COVID-19 business interruptions have ruled in

25  favor of defendants' interpretation.  That is true, I'm not

```
 1   running away from that.
 2             THE COURT:  You can't.
 3             MR. GARBER:  I can't.
 4             THE COURT:  It's overwhelming.
 5             MR. GARBER:  It's overwhelming.  But there are cases
 6   that find in favor of plaintiff's interpretation.  And I'd like
 7   the quote from Thomas versus Mutual Beneficial Health, 123
 8   F.Supp. 167, 171 (S.D.N.Y. 1954).  If judges learned in the
 9   law --
10             THE COURT:  Who is the judge?  I'm sorry to
11   interrupt.
12             MR. GARBER:  I don't have the judge written down, I
13   apologize, your Honor.
14             If judges learned in the law can reach so
15   diametrically conflicting conclusions as to what the language
16   of the policy means, it is hard to see how it can be held as a
17   matter of law that the language was so unambiguous that a
18   layman would be bound by it.  And that's what we have here.
19   There are judges, learned federal judges and state court
20   judges, that have read these exact terms and found that they
21   are, at worst for plaintiff ambiguous, and sometimes read it
22   as -- you have to read it as a loss of use falls within the
23   physical loss of.  And you can --
24             THE COURT:  You don't want me to count up how many
25   cases go your way and how many go against you.  The words
```

 1   themselves are what we're here to address.

 2          MR. GARBER:  Yes, your Honor.

 3          THE COURT:  It's the words and New York law, I

 4   presume, that governs this.  So several judges have come one

 5   way and others have come the other way.

 6          I get the gist of your point, which is, maybe that

 7   leads to a legal conclusion at my end that this is ambiguous or

 8   not, to me, I'm just focused on not anything more or less than

 9   what the words on the page look like to me.  And I struggle,

10   frankly, to see how they're ambiguous.  You may come to a

11   different conclusion, but I struggle.  So help me, if you can.

12   Now's your chance to get me to ambiguity, which is different

13   than -- and I appreciate -- and I don't want to interrupt your

14   argument, I want you to make the argument you want, but I don't

15   want to count up and keep score how many went one way or the

16   other way, and I don't really know that that's persuasive for

17   me.  Maybe somebody else, but for me.  The plain language is

18   the plain language.  If you find there's ambiguity, tell me

19   what it is, please.

20          MR. GARBER:  Well, your Honor, I think when you're

21   looking at -- and defendant raised this point, but I don't

22   think that their argument carries water.  You're talking about

23   direct physical loss of or physical damage to --

24          THE COURT:  It doesn't say that.

25          MR. GARBER:  Sorry.

68

```
1              THE COURT:  It says direct physical loss of.

2              MR. GARBER:  Or damage to.

3              THE COURT:  Or damage to.  Covered property.

4              MR. GARBER:  First you have the "or."  So to read

5    damages into physical loss, I think you're not reading physical

6    loss the way it should read which should include the loss of

7    the use of the property.

8              THE COURT:  I mean, this is a highly regulated

9    industry, and people spent careers laboring over these words,

10   and direct physical loss of covered property is what I think

11   this means, direct physical loss, or damage to the covered

12   property as if to say there are two columns, two choices, and.

13   So tell me, from your point of view -- I'm not arguing with

14   you, I stopped arguing legal issues about a year ago, and I

15   have to say, I'm delighted to be on this side of the bench, but

16   I remember being on that side of the bench for four decades.

17   So I don't want to interrupt you, and I want you to stay the

18   course, but tell me, please, how I get to ambiguity on direct,

19   direct physical loss of covered property.  How is that

20   ambiguous for me?  It's ambiguous, Judge, because?

21             MR. GARBER:  I think it's not ambiguous.  I think

22   it's in favor you have the plaintiff.  The plaintiff was

23   directly physically restricted from using the property as --

24             THE COURT:  But loss and use you agree are different.

25             MR. GARBER:  I do agree, your Honor, that loss and
```

1    use are different.  I would say, though, that you mentioned

2    that this is a heavily regulated industry, people spend their

3    careers doing this.  Why aren't these terms defined, your

4    Honor?  Why is property damage defined later?  And for a

5    layperson, when you see a term, property damage, where the

6    damage includes the loss of use that they define, that property

7    damage includes loss of use, that it cannot be included for

8    physical loss of or damage to.  If you're just a layperson,

9    they've defined damage as loss of use.  They chose to do that.

10   That didn't have to be in the contract.

11          THE COURT:  Layperson rule but all of our laypersons

12   when it comes to insurance policies; aren't we really?  And we

13   go to courts and we go to judges and say, what the heck does

14   this mean?  And judges say what it means.

15          Stay with your recipe.  I interrupted you.  You were

16   telling me that some judges say the opposite of what counsel,

17   Mr. Brown, has said, and so therefore I should consider the

18   reality that if learned judges come to different conclusions,

19   perhaps there should be a determination of ambiguity.

20          MR. GARBER:  Yes, your Honor.

21          THE COURT:  So I interrupted you.

22          MR. GARBER:  I think that that's a guiding principle

23   of law.  It is cited by the SDNY.  The Eight Circuit cited it.

24   And in one of the COVID-19 cases that went our way, the

25   *Cincinnati* case, the Court even said that, it said at best for

1   *Cincinnati* it's poor English that makes the term ambiguous,

2   which does not help *Cincinnati* in the present situation given

3   that the principle, that ambiguities in insurance policies are

4   typically construed against the insurer.  So at best it's poor

5   English for defendant.  At worst you can actually read it in

6   our favor based on their definition of property damage and

7   equating that they used damage.  So even a physical loss has to

8   include damage as well, they defined property damage to include

9   the loss of use.  So why should it include the loss of use when

10  they define it and not include it when they choose not to

11  define it.  That should be the interpretation of the physical

12  loss of and damage to, their definition of damage.  We should

13  be able to rely on that.

14          I would note that New York cases do recognize that

15  you don't need physical loss or damage to provide coverage,

16  that's the *Newman Myers* case, 17 F.Supp.3d 323, on summary

17  judgment holding that the risk of physical loss "does not

18  require that the physical loss or damage be tangible,

19  structural, or even visible."

20          Now, defendant points the Court to the *Roundabout*

21  case from the First Department --

22          THE COURT:  Yes.

23          MR. GARBER:  -- and said that it had the same

24  language as in this case.  That is simply not true, your Honor.

25          The *Roundabout* policy language says "The company

1    agrees to pay to the insured such loss as the insured shall

2    necessarily incur in the event of interruption, postponement,

3    or cancellation of an insured production as a direct and sole

4    result of loss of, damage to, or destruction of property or

5    facilities, including the theatre building occupied...by the

6    insured and certain equipment contracted by the insured for use

7    in connection with such production caused by the perils insured

8    against."  It's completely different language.  So it doesn't

9    bind this Court anyways, and it certainly doesn't provide the

10   guidance defendant says it does.

11           In fact, the facts of that case occurred because the

12   broker that got the theater the insurance didn't get civil --

13   essentially civil authority coverage as well.  So the insurer

14   sued the broker and settled and gave the claim to the broker,

15   and then the broken sued the insurer trying to recoupe what

16   they had paid the insured.  And the focus in the *Roundabout* was

17   whether coverage as triggered but property damage to the

18   offsite property belonging to someone else.  And so the Court

19   concluded that the losses resulting from offsite property

20   damage do not constitute perils under the policy.  It didn't

21   rule that physical loss of could never trigger business income

22   loss coverage.  Indeed, the Court's discussion of "loss of use"

23   is contained in a single, short paragraph in which the court

24   rejects the lower court's interpretation because loss of could

25   be interpreted in many ways.  That's at page 8 of the

1    *Roundabout* decision.  So in fact, you could read that case to

2    support the argument that a loss-of term without being defined

3    is ambiguous and could be defined to include the loss of use,

4    as, again, a minority of courts have done so without having

5    *Roundabout* as a guiding --

6            THE COURT:  *Roundabout* clearly says that loss of use

7    does not constitute physical loss or damage.  Loss of use does

8    not constitute physical loss or damage.

9            MR. GARBER:  I think interpreting a different

10   contract language and a different --

11           THE COURT:  No question.  I agree with you.  The

12   policies are not *in haec verba* the same.

13           MR. GARBER:  Right, and I think, your Honor, that can

14   apply, but I know you said you're not weighing, but yes, there

15   are a majority of defendants.  If you actually went through

16   each one of them, a bunch of them say loss to and not loss of,

17   and that is a distinguishing factor.  Some have completely

18   different language as well.  So if you were to focus on ones

19   that have this identical language, I think the scales would be

20   still in defendants' favor, I'm not trying to say they would

21   even out, but in think the disparity would become less

22   providing more --

23           THE COURT:  I have my only stable of COVID-19

24   business interruption insurance cases, as does everybody in the

25   building.  We have our own stable of them.  Each require a

1    careful review of the exact language.  And so when we talk

2    about things like *Roundabout*, of course the language isn't the

3    same, but the distinctions between and among clear words are

4    being articulated in those cases and others.  And so that's

5    what a judge, this judge looks at to try and understand.  I

6    don't have the corner on linguistics, but I sure can be

7    educated on what's clear and what's not clear.  So I understand

8    your point.  I interrupted you.

9            MR. GARBER:  No, it's good to be the judge, your

10   Honor.  It's perfectly okay.

11           THE COURT:  It's good to be the judge.  It is good to

12   be the judge, and I encourage all of you, if you have

13   aspirations, to go for it.  It really is wonderful.

14           MR. GARBER:  I'll just conclude this section with,

15   your Honor, I think reading physical loss of to require some

16   form of damages is ignoring the disjunctive as defendants said

17   you have to pay attention to the disjunctive, you can't read

18   out the section.  And to read physical loss of solely the way

19   defendants would you have this Court read, I don't think that

20   it's unambiguous that physical loss of is talking about this

21   one table is completely ruined and one table is half ruined,

22   and the one that is completely ruined is the physical loss of

23   and the one that is half ruined is damage to.  Whereas you

24   can't interpret the physical loss of.  The physical, physical,

25   that's my property, that's insured, I've lost -- obviously you

1     can't loose property, right, didn't go anywhere, I've lost the
2     ability to use my property.

3              THE COURT:  You could, it could go up in flames and
4     somebody could steal it.  Things could happen.

5              MR. GARBER:  And I think that would be damage to the
6     property not the physical loss of the property because the
7     property itself is still there.

8              On the virus exclusion, your Honor, I don't think I
9     need to spend too much time on it.  I can't say it better than
10    we said in the brief.  I think when you look at the plain
11    language of the virus exclusion policy that it shows that it's
12    directed towards excluding coverage for an actual viral
13    infestation of the contaminated covered property, and that
14    based on the proximate cause language we have in our briefs and
15    that the reading, as defendants want, the plain reading of the
16    language of the contract, and I know your Honor is going to
17    focus on it, that you read that, and New York law construing
18    the term resulting from, that's the term they focused on, it's
19    resulting from also not just related to.  That term is
20    construed narrowly, and when you look at the language about the
21    virus and infestation and contamination, that the virus
22    exclusion policy does not apply.

23             Similarly, the ordinance of law exclusion, they claim
24    that we're not looking at the language in the contract itself.
25    That's not true, your Honor.  We looked at the language in the

1    contract itself and then found case law interpreting similar

2    language that we have in our contract which then made clear

3    that similar language courts have said the only sensible

4    interpretation of the ordinance of law exclusion is that it

5    serves to eliminate the primary ambiguity that courts have

6    found in replacement cost policies; namely, whether a

7    policyholder can be reimbursed for the cost required to bring

8    the reconstructive property up to code.

9            So you know, again, your Honor, heavily regulated

10   industry, and then you have case law, this is from 2006, it's

11   saying that this is the interpretation that's long been the

12   interpretation of similar ordinance of law exclusions in and

13   policies.

14           THE COURT:  Do you agree that the insurance company's

15   interpretation of this is not for damage to your client's

16   property but to, in effect, a neighbor within one mile?  That's

17   the damage that has to take place in order for the civil

18   authority.  In other words, there has to be a scenario where

19   somebody in the neighborhood has had property damage and a

20   civil authority comes in and says you, your client, Mr. Garber,

21   is not allowed to go to his property or do damage in some way.

22   That's different than your property being damaged, right?

23           MR. GARBER:  Yes, your Honor.  Agree with that.  I

24   think we have alleged that, and the similar facts that apply to

25   our property apply to other properties within the required

1   vicinity and they were similarly caused the purpose of the

2   civil authority orders to be entered that then restricted our

3   ability to use our property, and that you can just have a loss

4   of use on the civil authority, you don't need the physical loss

5   of, you just need the damage to be someone else's property that

6   then spurns the -- leads to the civil authority then a loss of

7   use to be 100 percent acceptable under that provision.  So I

8   think your Honor hit it on the head, they simply said we don't

9   allege the necessary requirements of pleading such coverage.  I

10  think that they're clearly within the complaint, the shutdown

11  of property other than plaintiff's, the restriction then on the

12  covered premises in response to a dangerous physical condition

13  that caused the civil authority orders to be issued by the

14  State of New York, thereby causing my client injury.

15          With that, your Honor, I thank you for your time.

16          THE COURT:  Thank you.  Thank you, Mr. Garber.  I

17  appreciate your desire, and I appreciate you letting me up

18  interrupt you.

19          Mr. Brown, is there anything you want to add?

20          MR. BROWN:  Your Honor, if the Court has questions

21  for me, I'm happy to address that, otherwise --

22          THE COURT:  I really don't.  I'm going to take just a

23  brief recess here for one minute, two minutes, and I'll come

24  back out and give you my ruling.

25          (Recess)

```
 1              THE COURT:  I always appreciate how hard it is to get

 2    ready to make a presentation and how difficult it can be

 3    sometimes on one side or the other and the amount of effort and

 4    energy that goes into preparing.  I'm becoming an expert at

 5    reading briefs.  So I admire all the effort here.  So don't

 6    take the result as anything but what I believe to be the

 7    correct thing to do in the discharge of my oath.  So thank you.

 8    I appreciate it.

 9              And I do want to say before I forget I have another

10    case with Williams & Connolly.  I can't remember the case.  I

11    have a rule where I've offered to allow young lawyers less than

12    five years out of law school, if you write me and ask my

13    permission to have them come and argue, and it could be a bunch

14    of them, as long as they have authority and as long as they're

15    prepared properly, I'd be delighted to make time for those

16    young lawyers because it's a dying breed, the breed we're in,

17    and we need to encourage young people to take up this wonderful

18    opportunity to live life through the eyes of a litigator.

19              So I know Williams & Connolly had some in the other

20    case.  Take the message back we'll get to a date for you as

21    soon as we can.  We're all backed up right now with the

22    courthouse just opening.  We will bring those young people in,

23    and I'll spend all day listening if I need to because I want to

24    encourage them.

25              MR. BROWN:  I'll deliver the message, your Honor.
```

```
 1            THE COURT:  All right, the following is taken from

 2   the complaint and the documents annexed thereto, most

 3   specifically, the insurance policy.

 4            Plaintiff is incorporated in Sullivan County,

 5   New York and operates steel shelving manufacturing and

 6   refabricating facilities.  The insured premises are located in

 7   Woodbridge, New York.

 8            Plaintiff purchased the policy at issue on

 9   December 24, 2019, for a period effective from December 20,

10   2019, through December 20, 2020.

11            Plaintiff alleges that it was forced to shut down on

12   March 16, 2020, due to COVID-19 and Governor Cuomo's Executive

13   Orders directing all non-essential businesses in New York to

14   close.

15            As a result of the financial losses incurred during

16   the government-mandated shutdown, plaintiff alleges that on

17   March 22, 2020, it submitted a claim for insurance coverage.

18   Defendants responded with a letter denying coverage on June 9,

19   2020.

20            Defendants denied the claim because they "determined

21   that, (i) the claim does not satisfy the physical damage

22   requirement for loss of income coverage under the policy, or,

23   (ii) the claim is otherwise excluded from coverage because any

24   loss arises from a virus and the policy expressly excludes

25   coverage for loss or damage caused directly or indirectly by a
```

1  virus."

2         Plaintiff subsequently filed a breach of contract

3  complaint on July 24, 2020, the gravamen of which is plaintiff

4  was prohibited from accessing the premises by government

5  action, the closure was caused by a direct physical loss of or

6  damage to other properties, and the closure was caused by a

7  covered cause of loss because defendants' virus exclusion does

8  not apply to plaintiff's premises.  That's paragraph 54 of the

9  complaint.

10         Plaintiff brings one breach of contract claim.  For

11  count one, plaintiff seeks damages direct, consequential,

12  attorney's fees, and punitive damages.  Plaintiff also seeks,

13  styled as separate claims for relief, the declaratory judgment

14  relief in counts two and three.

15         Standard of review on a 12(b)(6) motion is that a

16  Court may dismiss a complaint for failure to state a claim upon

17  which relief may be granted.  To survive a motion to dismiss, a

18  complaint must contain sufficient factual matter accepted as

19  true to state a claim for relief that is plausible on its face.

20  The claim is plausible on its face when the pled factual

21  content allows the Court to draw the reasonable inference that

22  the defendant is liable for the misconduct alleged.  The

23  plausibility standard is not akin to a probability requirement

24  but it asks for more than a sheer possibility that a defendant

25  acted unlawfully.  The factual allegations pled must be enough

1    to raise a right to relief above the speculative level.  And of

2    course these are all quotations from *Twombly*, *Bell Atlantic v.*

3    *Twombly*, 550 U.S. 554 and *Ashcroft* 556 U.S. 662.

4            When there are well-pled factual allegations, a Court

5    should assume their veracity and then determine whether they

6    plausibly give rise to an entitlement to relief.  Thus, the

7    Court must take all well-pled factual allegations as true and

8    all reasonable inferences are drawn and viewed in the light

9    most favorable to the plaintiff.  The presumption of truth,

10   however, is of course inapplicable to legal conclusions and

11   threadbare recitals of the elements of a cause of action

12   supported by mere conclusory statements.  None of that

13   suffices.  Therefore, a plaintiff must provide more than labels

14   and conclusions to show entitlement.

15           The parties do not appoint specifically to a

16   choice-of-law provision specifying that New York law applies,

17   but the parties apply New York law in their moving papers, and

18   that's good enough according to the case law, *10012 Holdings v.*

19   *Sentinel Insurance*, 2020 WL 7360252 at *2 (S.D.N.Y. December

20   15, 2020) Judge Schofield.

21           Moreover, New York law applies because plaintiff's

22   policy concerns insurance for a New York based entity and

23   covers property in New York.  *Newman Myers v. Kreines Northern*

24   *Insurance*, 17 F.Supp.3d 323, 327.

25           Under New York law, insurance policies are

1    interpreted according to the general rules of contract

2    interpretation.  *Food for Thought v. Sentinel Insurance*, 2021

3    WL 860345 at *2, March 2021, Southern District decision.

4         Courts must give effect to the intent of the parties

5    as expressed by the clear language of their contract.

6         The insured party bears the burden of showing that

7    the insurance contract covers the loss.  The initial

8    interpretation of a contract and whether its terms are

9    ambiguous are questions of law for the Court to decide.

10        Here, policy terms are unambiguous where they provide

11   a definite and precise meaning unattended by any danger of

12   misconception in the purport of the contract itself and

13   concerning which there can be no reasonable basis for a

14   difference of opinion.

15        The great majority of the courts that have addressed

16   this issue of COVID insurance for business losses sustained

17   during the COVID-19 restrictions have held that a complaint,

18   which only alleges loss of use of the insured property fails to

19   satisfy the requirement for physical damage or loss.

20        The Court is not aware of and plaintiff has not cited

21   to any cases applying New York law where this type of breach of

22   contract claim arising from the denial of business interruption

23   and civil authority coverage in the COVID-19 context has been

24   sustained on a motion to dismiss.

25        As Magistrate Judge Lehrburger recently noted in a

1   report and recommendation to Judge Gardephe, "at least seven

2   different New York courts have interpreted business income

3   provisions in COVID-19 cases."  In all those cases, the Court

4   found that plaintiff's losses were not covered by the business

5   income provisions and granted the motions to dismiss.  *Sharde*

6   *Harvey v. Sentinel Insurance*, 2021 WL 1034259 at *6, a

7   March 2021 Southern District case.

8           Plaintiff alleges that it and similarly situated

9   class members have "suffered direct physical loss, loss of

10  business, and damage to its property because, as a result of

11  civil authority action, they have been unable to use its

12  properties for their intended purposes."  Paragraph 45 of the

13  complaint.

14          Plaintiff further alleges that it "was prohibited

15  from accessing the premises by the government action, the

16  closure was caused by direct physical loss of or damage to

17  other properties and the closure was caused by a covered cause

18  or loss because defendants' virus exclusion does not apply to

19  plaintiff's premises."  Paragraph 54 of plaintiff's complaint.

20          Because defendants have denied the plaintiff's

21  insurance claim, plaintiffs allege they breached the agreement.

22          Defendants argue in their memorandum that the policy

23  does not cover plaintiff's alleged losses for four distinct

24  reasons:

25              First, plaintiff fails to plausibly allege facts that

                Angela O'Donnell - Official Court Reporter
                            914-390-4025

1 would establish "direct physical loss of or damage to" its

2 property;

3      Two, plaintiff fails to plausibly allege facts

4 establishing that civil authority coverage applies;

5      Three, the virus exclusion bars coverage of

6 plaintiff's alleged losses; and

7      Finally, the ordinance or law exclusion bars coverage

8 for plaintiff's alleged losses.

9      I'll address each of those arguments seriatim.

10      First, plaintiff's first claim for breach of contract

11 covers first business interruption and then civil authority

12 coverage.

13      First with respect to business interruption coverage.

14      Under plaintiff's policy, defendants agree to "pay

15 for direct physical loss of or damage to covered

16 property...caused by or resulting from any covered cause of

17 loss."  Policy at page 73.

18      Covered cause of loss is defined as "direct physical

19 loss unless the loss is excluded or limited by the policy."

20 Policy again at page 107.

21      Plaintiff alleges direct physical loss of or damage

22 to its property.

23      Defendants argue that plaintiff has not pled facts

24 that, if proved, would establish a direct physical loss of or

25 damage to its property.

1          *Roundabout Theatre versus Continental Casualty* is a

2     case where the Appellate Division held that plaintiff, a

3     theatre company, "was not entitled to coverage because physical

4     damage to the theatre did not cause it to suspend its business

5     operations, and the policy clearly and unambiguously provided

6     coverage only where the insured property suffered direct

7     physical damage."  751 N.Y.S. 2d page 4, 8 (First Department,

8     2002); *also, Food for Thought*, 2021 WL 860345 at *3.

9          Since *Roundabout Theatre* was decided, courts applying

10    New York law have consistently concluded that loss of use of an

11    insured's premises does not trigger business income coverage

12    when the policy provides that such coverage requires evidence

13    of physical damage or physical loss.  *10012 Holdings* case, 2020

14    WL 7360252 at *2.  "New York courts interpreting substantially

15    identical language -- loss of, damage to, or destruction of

16    property or facilities -- have found that it is limited to

17    losses involving physical damage to the insured's property."

18    *See also United Airlines v. Insurance Company of State of*

19    *Pennsylvania,* 439 F.3d 128, 133 (Second Circuit, 2006); as

20    well*, Newman Myers v. Great Northern Insurance Company*, 17

21    F.Supp.3d 323, 331, a Southern District 2014 case; *Michael*

22    *Cetta v. Admiral Indemnity Co.*, 2020 WL 7321405 at *5-8, Judge

23    Cronan's decision in December 2020.

24          Here, the plaintiff alleges that it and both class

25    members suffered direct physical loss, loss of business, and

1   damage to its property because "they have been unable to use

2   its property for their intended purposes."  That's paragraph 45

3   of plaintiff's complaint.  But under *Roundabout Theatre*, such

4   loss of use simply does not constitute physical loss or damage.

5   *Roundabout Theatre*, 751 N.Y.S. 2d at *8.

6           Plaintiff further argues in its opposition that any

7   reasonable interpretation would interpret the policy as

8   encompassing situations where a business owner is deprived of

9   physical access.  That's in their brief at page 10.  But the

10  Appellate Division rejected that very same argument in

11  *Roundabout Theatre*.  There, at page 4, the panel explained that

12  "the Appellate Division rejected the argument that interpreting

13  loss of to require more than loss of use.  Rendered the phrase

14  physical damage superfluous."

15          Moreover, other courts have been persuasive that loss

16  of could also indicate absolute destruction of the insured

17  property, whereas damage implies a lesser, repairable harm.

18          Plaintiff also argues that its interpretation of the

19  phrase direct physical loss of is proper and correct because it

20  is consistent with other courts' holdings.  That's at page 11.

21  But plaintiff hasn't cited any case for this proposition that

22  is binding on me.

23          Lastly, plaintiff argues that numerous courts agreed

24  that government-issued COVID-19 shutdown orders do trigger

25  physical loss or damage coverage.  Plaintiff relies on *Studio*

1    *417 v. Cincinnati Insurance*, 2020 WL 4692385, Western District

2    of Missouri case, 2020.  As defendants have pointed out,

3    however, *Studio 417* is based on allegations that "COVID 19

4    particles attached to and damaged the plaintiff's property."

5    Here, however, plaintiff asserts that "there is no indication

6    that the COVID-19 virus impacted plaintiff's premises or caused

7    it to incur any virus-related expenses."  That's the complaint

8    at paragraph 75.

9            Even if plaintiff had alleged that the presence of

10   the virus on his property had caused physical damage thereto,

11   Judge Koeltl recently and persuasively explained that

12   contamination of the premises by a virus does not constitute a

13   direct physical loss because the virus's presence can be

14   eliminated by routine cleaning and disinfecting, and an item or

15   structure that merely needs to be clean has not suffered a

16   direct physical loss.  That's the *Food for Thought*, 2021 WL

17   860345 at *5.

18           The Court therefore cannot be persuaded by

19   plaintiff's arguments.  The Court agrees with the defendants

20   that the plaintiff has failed to plausibly allege direct

21   physical loss of or physical damage to its property as a result

22   of COVID-19 and the accompanying Executive Orders.

23           Plaintiff's second branch of its breach of contract

24   claim stems from a civil authority provision and policy.

25           Under plaintiff's policy "when a covered cause of

1    loss causes damage to property other than property at the

2    described premises" I'm inserting defendants, "will pay for the

3    actual loss of business income you sustain and necessary extra

4    expense caused by action of civil authority that prohibits

5    access to the described premises, provided that both of the

6    following apply:

7            "One, access to the area immediately surrounding the

8    damaged property is prohibited by civil authority as a result

9    of the damage, and the described premises are within that area

10   but not more than a mile from the damaged property; and

11           "Two, the action of civil authorities taken in

12   response to dangerous physical conditions resulting from the

13   damage or continuation or the covered cause of loss that caused

14   the damage or the action is taken to enable a civil authority

15   to have unimpeded access to the damaged property."  That's the

16   policy at page 9.

17           I'm just breathing and giving the court reporter an

18   opportunity to breathe.  Let's enjoy breathing in the courtroom

19   the together for a moment.

20           Here, plaintiff alleges that as was reasonably

21   understood by plaintiff, the covered causes of loss include all

22   risks of direct physical loss, including those resulting from

23   civil authority action.  Complaint, paragraph 43.  Plaintiff

24   further alleges that it and its proposed class members "have

25   been unable to use its properties for their intended purposes

1    as a result of the civil authority action."  Paragraph 45 of

2    the complaint.

3          Again, because the defendants have denied the

4    plaintiff's claim for civil authority coverage, plaintiff

5    alleges that the defendants have breached the insurance

6    agreement.

7          The gist of the civil authority coverage is that

8    physical harm to someone else's premises has caused the civil

9    authorities to prohibit access to the insurance premises.

10   Under the COVID-19 Executive Orders, however, the insured

11   premises and its neighbor's premises are restricted for the

12   same reasons; to limit the risk of spreading COVID-19 virus.

13   This state of fact simply does not implicate civil authority

14   coverage.

15         In another case involving COVID 19 coverage, the

16   learned Judge Cronan found that a civil authority provision

17   identical to the one in plaintiff's policy requires that there

18   was damage to property other than its own and that the action

19   of civil authority prohibited access to both plaintiff's

20   property and to the area immediately surrounding the damage.

21   That's the *Michael Cetta* case at page 11.

22         First, plaintiff does not plausibly allege any

23   specific damage to property near the insured premises.  The

24   complaint only vaguely alludes to the fact that the closure

25   orders affected businesses besides itself.  Paragraph 45 of the

1    complaint refers to "other similarly situated persons or

2    businesses that suffered direct physical loss, loss of

3    business, and damage to their property as a result of civil

4    authority action."  The complaint at paragraph 30 also states,

5    "many businesses have been adversely impacted by civil

6    authorities' lockdown orders."  Without specific allegations

7    that a neighboring property suffered damage to property, the

8    complaint fails to state that it is plausible on its face and

9    it fails to state plaintiff's entitlement to civil authority

10   coverage.

11          Secondly, even if the plaintiff had properly alleged

12   that neighboring property suffered damage, the complaint fails

13   to allege that access was ever denied to the insured property

14   or the area immediately surrounding the damaged neighboring

15   property, two necessary prerequisites for this form of

16   coverage.  Under the policy, civil authority coverage would

17   only apply if, among other things, civil authority prohibited

18   access to the insured property and prohibited access to an area

19   immediately surrounding the damaged property.  Here, plaintiff

20   alleges only that it "was prohibited from accessing the

21   premises by government action."  Again, paragraph 54 of the

22   complaint.  Paragraph 45 does indicate "as a result of civil

23   authority action, plaintiff and putative class members have

24   been unable to use their property for their intended purposes."

25          Governor Cuomo's Executive Order on March 20, 2020,

1    required that "all non-essential businesses and non-profits

2    reduce their in-person workforce by 100 percent.  But this

3    workforce reduction requirement does not amount to a denial of

4    access to the property."  *Food for Thought*, 2021 WL 860345 at

5    *6.  Indeed, unlike a situation, for example, of an unsafe

6    condition at an adjoining property requiring a safety

7    evacuation of a covered property, the owner of the property can

8    continue to access the property despite the total reduction in

9    workforce.

10            Defendants have the proper argument.  Plaintiff's

11    allegations, which, if proved, simply would not trigger civil

12    authority coverage.

13            Even assuming, even assuming that the plaintiff had

14    sufficiently alleged, which I have just found it has not, a

15    breach of contract claim stemming from the defendants' denial

16    of business interruption and civil authority coverage,

17    plaintiff would still be unable to plead its way around the

18    virus exclusion and the ordinance or law exclusion contained in

19    the policy.

20            First, with respect to the virus exclusion.

21            Plaintiff's policy includes a virus exclusion that

22    states, "we will not pay for loss or damage caused by or

23    resulting from any virus, bacterium, or other microorganism

24    that induces or is capable of inducing physical distress,

25    illness, or disease."  That's the policy, and when I say the

1    policy throughout, I'm referring to the policy annexed to the

2    Complaint as Exhibit A, and this particular provision is at

3    page 106.

4            Here, the government-mandated shutdown was clearly

5    the cause of plaintiff's alleged business losses.

6            The Executive Orders, and by extension, plaintiff's

7    business losses, would not have occurred but for the onset of

8    COVID-19.  *See Turek Enterprises v. State Farm Mutual Auto*

9    *Insurance*, 2020 WL 5258484 at *8.  "The order," meaning the

10   government's order, "expressly states that it was issued to

11   suppress the spread of COVID-19 and accompanying public health

12   risks.  The only reasonable conclusion is that the order, and

13   by extension, plaintiff's business interruption losses, would

14   not have occurred but for COVID-19."

15           Further, COVID-19 was a substantial cause of

16   plaintiff's alleged business losses and the like Executive

17   Orders.  Those losses were a normal or foreseeable consequence

18   of the onset of COVID 19.  *Allison v. Rite Aid Corp*., 812

19   F.Supp.2d 565, 568, Southern District 2011 case, stands for the

20   proposition that an act proximately causes a certain event when

21   the act is a substantial cause of the event or where the event

22   is a normal and foreseeable consequence of the act.

23           Therefore, because plaintiff's allege business loss

24   was caused by or resulting from the spread of the COVID-19

25   virus, the claim loss falls squarely within the policy's virus

 1   exclusion.

 2          The ordinance or law exclusion fares to no better.

 3   The plaintiff's policy states "we will not pay for loss or

 4   damage caused directly or indirectly by the enforcement of or

 5   compliance with any ordinance or law regulating the

 6   construction, use, or repair of any property, even if the

 7   property has not been damaged."  Policy at page 107.

 8          This exclusion is triggered by the Executive Orders,

 9   because those orders have the force of law, and they regulate

10   the use of property.

11          No one can dispute that Governor Cuomo's Executive

12   Orders carry the force of law.  Indeed, *Luke's Catering Service*

13   *v. Cuomo*, a Western District 2020 case, 2020 WL 5425008 at *2

14   states, "in response to this public health crisis, the New York

15   Legislature amended Sections 20 and 29-a of the New York

16   Executive Law in early March 2020 to grant the governor broad

17   powers to manage, prepare, and respond to and contain the

18   threat posed by the virus."  The language of the Executive

19   Order also suggests a similar conclusion.

20          The plaintiff alleges that because "it has been

21   unable to use its property for their intended purposes, it

22   suffered you direct physical loss, loss of business, and damage

23   to his property".  Again, paragraph 45.  This inability to use

24   the property was caused directly or indirectly by the

25   enforcement of or compliance with Governor Cuomo's Executive

1    Order regulating the use of plaintiff's property.  Therefore,

2    the ordinance or law exclusion also precludes the plaintiff's

3    claims.

4            Accordingly, and because it would be futile to

5    suggest an amendment to plaintiff's claims, Count One is

6    dismissed with prejudice.

7            The remaining claims for relief are styled

8    declaratory judgment.  I want to just politely say that it is

9    very well established in the Southern District of New York and

10   elsewhere that a declaratory judgment is a remedy and not a

11   claim for relief.  *Johnson v. Magnolia Pictures*, 2019 WL

12   4412483 at *5, one of thousands of cases in the Southern

13   District.  Plaintiff cannot sustain an independent claim for

14   relief or declaratory judgment.  A declaratory judgment is a

15   remedy not a claim for relief.

16           A request for the relief in the form of a declaratory

17   judgment does not establish a case or controversy involving an

18   adjudication of rights.  That's *In re Joint Distribution*

19   *Asbestos Litigation,* I'm probably butchering that name, 14 F.3d

20   726, 731, a Second Circuit 1993 case.  That panel also found

21   that the Declaratory Judgment Act does not expand jurisdiction,

22   nor does it provide an independent claim for relief.  Its

23   operation is procedural only to provide a form of relief

24   previously unavailable in court.  Therefore, a Court may only

25   entertain declaratory judgment relief in favor of a party who

1   has a substantive claim of right to such relief.

2       Accordingly, I'm dismissing the count two and

3   count three of the complaint with prejudice.

4       For all of these reasons, the defendants' motion to

5   dismiss for failure to state a claim is granted with prejudice.

6   I'll issue a short form order today.  This constitutes the

7   decision and order of the court.  Transcript, if you so choose,

8   is available.

9       I've tried to address each and every one of the

10   arguments in a way that makes sense to me first considering the

11   claims for relief and then the exclusions.  I realize, I

12   realize that COVID-19 has caused unfathomable loss and injury

13   to people, families, businesses, but this case is not about

14   that.  This case is about terms and conditions of what I have

15   found to be a claim a plain, clear, and unambiguous policy of

16   insurance.  So nothing here should be construed to suggest that

17   that the Court, this judge or otherwise thinks that people who

18   have been adversely affected shouldn't try every which way they

19   can to get back to normal, as we all are.  It's just that

20   policy doesn't permit it, and that's what I was here to decide.

21   So I have now decided.

22       Counsel, is there anything else we can do for each

23   other today?

24       MR. BROWN:  No, your Honor.

25       MR. GARBER:  No, your Honor.  Thank you.

1              THE COURT:  Thank you.  I very much appreciate all

2     the energy and effort that went into the argument, and I look

3     forward to seeing you again in my courtroom.

4              MR. BROWN:  Thank you, your Honor.

5              MR. GARBER:  Thank you, your Honor.

6              THE DEPUTY CLERK:  All rise.  Court is in recess.

7              (Proceedings concluded)

8     CERTIFICATE:  I hereby certify that the foregoing is a true and
      accurate transcript, to the best of my skill and ability, from
9     my stenographic notes of this proceeding.

                   ------------------------------------
10    Angela A. O'Donnell, RPR, Official Court Reporter, USDC, SDNY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Angela O'Donnell - Official Court Reporter
                              914-390-4025